UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Shenzhen Liqiu Sanhou Technology Co., Ltd<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>Xiaoling Che,<br><br>　　　　　　Defendant. | **CASE NO.** 24-cv-11980<br><br>**Judge Andrea R. Wood**<br><br>**Magistrate Judge Heather K. McShain** |

**PLAINTIFF'S EMERGENCY *EX PARTE* MOTION FOR ENTRY OF A<br>TEMPORARY RESTRAINING ORDER**

Plaintiff Shenzhen Liqiu Sanhou Technology Co., Ltd ("Plaintiff" or "Sanhou-SH" or "Playboda") submits this Motion for Entry of a Temporary Restraining Order ("TRO") against Defendant Xiaoling Che ("Defendant" or "Che"). Plaintiff states as follows:

I.  **STATEMENT OF FACTS**

a) **Amazon Intellectual Property Protection Procedure**

Amazon's intellectual property protection system allows rights owners to file complaints alleging infringement. While the system aims to protect rights, Amazon employees do not evaluate evidence with the same rigor as courts. For example, when a patent owner files a complaint, Amazon may act on a patent certificate without verifying its validity or considering potential fraud, often shutting down the respondent's store. This flaw is exploited by individuals like the Defendant, who knows that the accused product does not infringe his/her patent yet still misuse Amazon's system to target legitimate sellers and eliminate competition.

b) **Defendant's Fraudulent Actions**

On November 14, 2024, Plaintiff received a Notice from Amazon stating that certain ASINs, B0CQSZMJBS and B0C7QFLV8L were removed due to a patent infringement complaint for the U.S. Patent No. 11,478,551. ("'551 Patent") filed by the Defendant. The Notice from Amazon sent to Plaintiff are attached hereto as **Exhibit A.** The '551 Patent is attached as **Exhibit B**. In the Notice, Amazon provided Plaintiff with the Rights Owner's contact details: john.handy@rimonlaw.com. The '551 Patent is entitled "Movable Puzzle Platform" Patent and has a sole independent claim. Amazon has removed Plaintiff's Puzzle Board from the marketplace, preventing Plaintiff from accessing its largest channel of trade because of Defendant's infringement complaint. Thus, Defendant's submission of Amazon infringement complaint has caused and continues to cause immediate and irreparable harm to Plaintiff.

II.  **ARGUMENT**

Defendant's purposeful, intentional, and unlawful conduct is causing and will continue to cause irreparable harm to Plaintiff's reputation and goodwill. Rule 65 of the Federal Rules of

1

Civil Procedure provides that the Court may issue a TRO where immediate and irreparable injury, loss, or damage will result to the applicant. The entry of a TRO is appropriate because it would immediately stop the Defendant from benefiting from its planned wrongful use of its Patent.

This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Patent Laws of the United States, 35 U.S.C.§ 100 *et seq.*, 28 U.S.C. §§ 1338(a)-(b), and 28 U.S.C. § 1331. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

Venue is proper under 28 U.S.C. § 1391, as Defendant targets U.S. consumers, including those in Illinois, through an interactive Amazon store, engaging in interstate commerce. Defendant wrongfully accused Plaintiff of infringement, causing harm to Plaintiff's business and sales in this District. Further, this Court may properly exercise personal jurisdiction over Defendant because Defendant has previously availed himself of this Court by filing a lawsuit against other Amazon sellers in this District(24-cv-9573). Defendant's prior litigation conduct demonstrates a deliberate connection to this forum, further supporting the propriety of this Court exercising personal jurisdiction over Defendant in this action.

Without the benefit of an evidentiary hearing, Plaintiff bears only the burden of making a *prima facie* case for personal jurisdiction; all of Plaintiff's asserted facts should be accepted as true and any factual determinations should be resolved in its favor. *Purdue Research Found. v. Sanofi-Sythelabo*, S.A., 338 F.3d 773, 782 (7th Cir. 2003) ("When determining whether a plaintiff has met his burden, jurisdictional allegations pleaded in the complaint are accepted as true unless proved otherwise by defendants' affidavits or exhibits.").

c) **Standard for Temporary Restraining Order**

District Courts within this Circuit hold that the standard for granting a TRO and the standard for granting a preliminary injunction are identical. *See, e.g.Charter Nat'l Bank & Trust*

2

*v. Charter One Fin., Inc.*, No. 1:01-cv-00905, 2001 WL 527404, at *1 (N.D. Ill. May 15, 2001) (citation omitted). A party seeking to obtain a preliminary injunction must demonstrate: (1) that its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that it will suffer irreparable harm if the injunction is not granted. *See Ty, Inc.v. The Jones Group, Inc.,* 237 F.3d 891, 895 (7th Cir. 2001). If the Court is satisfied that these three conditions have been met, then it must consider the harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Id*. Finally, the Court must consider the potential effect on the public interest (non-parties) in denying or granting the injunction. *Id*. The Court then weighs all these factors, "sitting as would a chancellor in equity," when it decides whether to grant the injunction. *Id*. (*quoting Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). This process involves engaging in what the Court has deemed "the sliding scale approach" – the more likely the plaintiff will succeed on the merits, the less the balance of harms need favor the plaintiff's position. *Id.*

### d) Plaintiff Will Likely Succeed on the Merits

In determining **patent infringement**, the "essential inquiry" is this: "Does the accused product or process contain elements **identical** or **equivalent** to each claimed element of the patented invention?" *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997); *see also Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001) (" 'In order for a court to find infringement, the plaintiff must show the presence of every ... [limitation] or its substantial **equivalent** in the accused device.' ")

A finding of non-infringement of **an independent claim necessarily means that a claim of infringement of the dependent claim fails**. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870

3

F.2d 1546, 1553 (Fed. Cir. 1989) ("It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed."). Since the '551 Patent **contains only one independent claim**, if that claim is not infringed, there is no need for Plaintiff to address the remaining dependent claims.

If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law. *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1374 (Fed. Cir. 2009). Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1129 (Fed. Cir. 2008). However, if the accused product is missing an equivalent element to even one limitation recited in the asserted patent claim, it cannot infringe the claim under the doctrine of equivalents. *AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005).

> The independent claim is stated as follows:
> "A movable puzzle platform for placing a plurality of puzzle pieces thereon, comprising: a puzzle board comprising a top surface for placing the puzzle pieces thereon; and a board accessible unit comprising a first moving member coupled with said puzzle board, a second moving member, and a first bearing unit coupled between said first moving member and said second moving member, wherein said first moving member is rotatably mounted to said second moving member by said first bearing unit, enabling said puzzle board to be self-rotated on said playing surface; the second moving member having a flat base and a protrusion protruded from the center of the flat base toward the first moving member for engaging with the first bearing unit; wherein an outer circumferential surface of said first moving member is engaged with an inner circumferential surface of said second moving member via said first bearing unit to enable said second moving member being coaxially rotated with respect to said first moving member."

Playboda has numerous substantial differences compared to the limitations of claim 1. The **fundamental difference** is that **Playboda lacks the "first bearing unit" and the "first moving member" as required by claim 1**, both in a literal sense and under the doctrine of

4

equivalents. This distinction alone is sufficient to establish that Playboda does not infringe claim 1. *See* Playboda's pictures (annotated) below. Picture of Playboda Product is show Exhibit 1 attached to Huang Decl.

Playboda features a bearing inner ring (6203RS bearing[1]) integrated at the center of the puzzle board and multiple circumferentially distributed cylindrical rollers solely for the purpose of reducing friction. Even if the defendant were to arbitrarily or forcibly identify this bearing inner ring and the cylindrical rollers as the "first moving member" and "first bearing unit" described in claim 1, either literally or under the doctrine of equivalents, the plaintiff still identifies the following four (4) substantial distinctions. These distinctions demonstrate that such identification would fail to establish infringement.



Difference 1: **Playboda's cylindrical roller neither has, nor requires, nor is capable of being coupled between bearing inner ring and a second moving member.** Refer to the Playboda product image above, where it can be seen that Playboda's cylindrical roller is actually

---

[1] The 6203RS bearing is a deep groove ball bearing ("6") with a standard width ("2") and a 17mm inner diameter ("03"). The "RS" indicates a rubber seal for protection and lubrication retention. It has been in the Market for decades. See image below

5

coupled between Playboda's puzzle board and the second moving member of Playboda. More specifically, Playboda's cylindrical roller is merely mounted on the second moving member of Playboda and has no mounting relationship with any other components of Playboda. This difference is substantial, and the presence of Difference 1 alone is sufficient to conclude that Playboda does not infringe claim 1. See Playboda's pictures (annotated) below.

Difference 2: **Playboda's bearing inner ring neither has, nor can, nor needs to be mounted to the second moving member by cylindrical roller.** Specifically, Playboda's bearing inner ring itself is already a part of a bearing structure. Playboda's bearing inner ring is integrated with the central part of Playboda's puzzle board. The inner ring portion and the fixed portion achieve relative rotation through a bearing structure (e.g., embedded ball bearings) between them, allowing the inner ring of Playboda's first moving member to rotate relative to Playboda's puzzle board. Consequently, Playboda's first moving member can rotate directly relative to Playboda's puzzle board.



Furthermore, the mounting configuration between Playboda's bearing inner ring and Playboda's second moving member is achieved by a snap-fit component on the intermediate part of Playboda's second moving member. This snap-fit component has some elasticity, allowing it to be inserted into the Playboda's bearing inner ring and maintain an interference fit (through elastic deformation), thereby mounting Playboda's second moving member onto Playboda's bearing inner ring. Most importantly, when Playbod's second moving member is mounted onto

6

Playboda's inner ring portion, Playboda's second moving member and Playboda's inner ring are fixed together as one unit (through interference fit). At this point, there is no relative rotation between them, meaning Playboda's second moving member and Playboda's inner ring portion rotate together synchronously with respect to the puzzle board in a 360-degree motion. This is fundamentally different from the arrangement in claim 1.



In other words, in claim 1, the rotation of the puzzle board is indirectly driven by the relative rotation between the first moving member and the second moving member. However, in Playboda, rotation is directly achieved through the rotational assembly mechanism between the puzzle board and the first moving member (using the embedded bearing). Essentially, Playboda's second moving member can be considered an extension of Playboda's first moving member (as there is no relative rotation between them). Further evidence of this point is that when all of Playboda's first bearing units are completely removed, Playboda can still rotate. This means that Playboda's first bearing units only play an auxiliary role in reducing friction, whereas the first bearing units in claim 1 are clearly the core and sole components providing rotational capability, which cannot be removed.

Additionally, it can be observed that Playboda's first bearing units are distributed annularly along the outer peripheral edge of Playboda's second moving member, far from Playboda's first moving member.

Difference 3: **Playboda's second moving member neither has, nor can have, nor needs to have a protrusion extending from the center of the flat base toward Playboda's bearing inner ring for engaging with the cylindrical roller.** On the contrary, Playboda's second moving member has multiple cylindrical recesses recessed downward from its flat base (i.e., these recesses are oriented away from Playboda's bearing inner ring). These recesses are designed to rotatably accommodate multiple cylindrical rollers of Playboda, allowing these cylindrical rollers to function as friction-reducing components between Playboda's puzzle board and the second moving member (when Playboda's puzzle board rotates directly relative to its second moving members).



Difference 4: **The outer circumferential surface of Playboda's bearing inner ring neither has, nor can, nor needs to be engaged with the inner circumferential surface of Playboda's second moving member via Playboda's cylindrical roller.** Specifically, the outer circumferential surface of Playboda's bearing inner ring refers to the outer circumferential surface of the inner ring portion of the first moving member. This outer circumferential surface of the bearing inner ring is engaged with the fixed portion. In other words, the outer circumferential surface of Playboda's bearing inner ring does not make contact with any part of Playboda's second moving member, let alone engage with the inner circumferential surface of Playboda's second moving member, or engage with it via Playboda's cylindrical roller.

Furthermore, the inner circumferential surface of Playboda's second moving member is

enclosed within the main cavity of Playboda's second moving member, making it impossible for it to contact any part of Playboda's bearing inner ring. As previously discussed, Playboda's second moving member is coupled to Playboda's bearing inner ring via a snap-fit component located at its center.

The four differences discussed above are substantial, whether based on their literal meanings or under the doctrine of equivalents. Therefore, Playboda does not infringe claim 1.

### e) There Is No Adequate Remedy at Law, and Plaintiff Will Suffer Irreparable Harm in the Absence of Preliminary Relief

To obtain an injunction, the plaintiff must show the "threat of irreparable harm without adequate remedy at law." *Roland Machinery Co. v. Dresser Indus., Inc*., 749 F.2d 380 (7th Cir.1984). The Seventh Circuit has held that "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill...." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 902 (7th Cir.2001). Thus, these types of injuries are presumed irreparable. *Id.*; *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir.1994) ("We have stated that showing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages."); *Reinders Bros. v. Rain Bird E. Sales Corp*., 627 F.2d 44, 53 & n. 7 (7th Cir.1980) (loss of small but valuable portion of clientele not compensable in monetary damages); *see also Northwest Bakery Distrib., Inc. v. George Weston Bakeries*, No. 04 C 8233, 2005 WL 55144 at *4 (N.D.Ill. Jan.11, 2005) ("[P]laintiff's loss of goodwill, key relationships and current experience and know-how will not easily be repaired and will certainly not be readily compensable in damages.")

Moreover, the potential loss of Plaintiff's revenues and the inevitable layoffs that would be triggered by the loss of business, (Huang Decl, at ¶19), would impose real harms on Plaintiff that could not be simply undone by a future decision in its favor. *See Girl Scouts of Manitou*

9

*Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008) ("[S]imply returning [60% of plaintiff's business territory] following trial will not account for the incalculable losses [plaintiff] risks in the interim—namely, the potential loss of property, employees, or its entire business, as well as damage to its goodwill. These harms are both real and irreparable.").

Precedent in this district also supports the loss of market share and revenue during the pendency of this litigation constitute irreparable harm. *See. e.g., Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (likelihood of price erosion and loss of market position are evidence of irreparable harm); *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (loss of revenue, goodwill, and research and development support constitute irreparable harm); *Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996) (loss of market opportunities cannot be quantified or adequately compensated, and is evidence of irreparable harm).

Regarding the adequacy of legal remedies, Plaintiff can establish that money damages would not sufficiently compensate it for the loss of its business. "A damages remedy need be 'seriously deficient,' but not 'wholly ineffectual.' " *Girl Scouts*, 549 F.3d at 1095 (quoting *Roland Mach. Co. v. Dresser Inds., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)). The U.S. Court of Appeals for the Seventh Circuit has identified several circumstances resulting in an inadequate legal remedy, including "when a damages award may come too late to save the plaintiff's business" because the business "will lack the cash flow necessary to sustain the fixed costs of operating its business" without the injunction. *Id*. Even when the value of a plaintiff's business could be calculated, the Seventh Circuit nonetheless "recognize[s] that a longstanding business often has a vested interest in continuing in that business, not simply in receiving the monetary

equivalent of its operation." *Id.* ; *see also Roland Mach*., 749 F.2d at 386 (observing that "the right to continue a business is not measurable entirely in monetary terms" when the plaintiff would rather run its business than "live on the income from a damages award" (citation omitted)). If the movant's loss would not result in the total ruin of its business, it may still defy accurate calculation of damages because of unquantifiable impairment of the business's capacity. *See, e.g., Girl Scouts*, 549 F.3d at 1095 (finding the plaintiff's damages "virtually impossible to compute" based in part on "the potential loss of institutional knowledge accompanying the unwanted termination of employees"); *Ty, Inc*, 237 F.3 at 902 ("[I]t is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill[.]" (citation omitted).

The Defendant's actions are consistent with the conduct discussed above, deliberately aiming to undermine the Plaintiff's goodwill, reputation, and client base. By disseminating false information and making unfounded patent infringement claims, the Defendant seeks to discredit the Plaintiff while eroding the trust of its critical business partner, Amazon, and its potential customers. Furthermore, the use of the '551 Patent serves as a coercive tactic to intimidate both the Plaintiff and Amazon, inflicting significant harm on the Plaintiff's business operations and reputation. These deliberate actions exhibit a blatant disregard for ethical business practices and fair competition. As a result, the Plaintiff has suffered substantial harm to its operations and reputation, as stated in the Huang Declaration at ¶15.

Before the Defendant's complaint, the Plaintiff held a market share of approximately 15~20% on Amazon, and its product was ranked No. 3 on the platform. Huang Decl. at ¶9. However, due to the Defendant's actions, the Plaintiff's market share on Amazon has dropped to zero. The declarations of Huang establish that the potential loss of the Plaintiff's Amazon store

11

poses a significant risk to the Plaintiff's ability to sustain its business operations. The Plaintiff has also demonstrated that a total shutdown of its Amazon store would result in a significant revenue loss, leading to major workforce reductions. Being forced to terminate employees would constitute a significant and lasting harm to the Plaintiff's business. This situation threatens to cripple or entirely destroy the Plaintiff's operations, which monetary damages cannot remedy.

Plaintiff's previous daily sales were approximately $8000 per day, but now the sales have dropped to $0. Plaintiff's store previously generated annual sales of approximately $3 million. It is not feasible for the Plaintiff to simply abandon the store and leave the United States. The Plaintiff's business relies heavily on its Amazon presence, and any harm to this business cannot be easily undone by a future monetary judgment.In preparation for the holiday sales peak, Plaintiff prepared 14,000 units of inventory, worth about 250,000 usd, all of which are now at risk of being destroyed by Amazon. Huang Decl. at ¶¶11-12.

Additionally, the Defendant is a Chinese citizen with no assets in the United States. The Plaintiff's business is at risk of collapsing before the resolution of this lawsuit. Even if the Plaintiff prevails, enforcement of any judgment against the Defendant would be nearly impossible, as the Defendant could evade liability by sheltering in China. Other courts have recognized the urgency of similar circumstances. For instance, in one Eastern District of New York case, 22-cv-7734, the court issued an order to mitigate the harm caused by such tactics. Similarly, in 23-cv-0268, Judge Valderrama required the opposing party to withdraw its complaint until the litigation concluded. Exhibit C; Ruoting Men Decl. in support of Ex Parte TRO, at ¶¶ 14-15.

In light of these facts, the Plaintiff respectfully requests the Court to issue an order requiring the Defendant to retract his/her complaint against the Plaintiff to Amazon until this

case is fully resolved.

### f) The Balancing of Harms Tips in Plaintiff's Favor, and the Public Interest Is Served by Entry of the Injunction.

A TRO is necessary to prevent Plaintiff from losing their selling rights on Amazon. Here, Plaintiff requests a temporary injunction requiring that the Defendant refrains from filing future complaints using the '551 Patent. Plaintiff also requests a temporary injunction ordering that the Defendant retract the already filed complaint to Amazon (Complaint ID: 16652447091 ). Should the Court ultimately find that the Asserted Patent is valid and enforceable, and the Asserted Patent is infringed, which Plaintiff believes to be highly unlikely, Defendant may recover damages based on well-established Patent infringement damage accounting practices.

The interest in the public is the last factor that the Court must examine. Here, public interest is compelling for several reasons. First, the public has a strong interest in stopping abusive Amazon patent practices and preserving market competition, especially where, as here, **the validity and enforceability of the patent at issue are exceedingly dubious**. "[T]he public interest is served by such an injunction against the assertion of what at this preliminary stage clearly and convincingly appears to be wrongful and fraudulent claims to a right to a trademark." *Country Fare LLC*, No. 2011 WL 2222315, at *10; cf. *N.Y.C. Triathlon, LLC*, 704 F. Supp. 2d at 344"[T]he public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality.")

Second, as court has recognized in other district, "the public interest is in fact benefited by granting a TRO, because absent [Amazon's] polices, designed to avoid [Amazon's] liability for intellectual property infringement, it would be the claimed [trademark] holder who would bear the burden of proving the [trademark] infringement." *Beyond BlondProds. v. Heldman,* 479 F. Supp. 3d 874,888 (C.D. Cal. 2020). **"To withhold a TRO would allow anyone to effectively**

13

**shut down a competitor's business on [Amazon] simply by filing the notice that the [competitor's] product allegedly infringes on the complaining parties [Patent]."** *Id*.

Finally, considering the widespread use of Amazon shopping among the general public, there exists a vested interest in maintaining a comprehensive and equitable online marketplace. In this context, the Defendant may exploit the enforcement of its illegitimate '551 Patent rights, unfairly harming the plaintiff's businesses. It is in the public's best interest to foster a competitive market environment where consumers have access to a variety of options. Allowing a fraudulent patent holder to drive out competition through malicious complaints would only serve to limit consumer choice and stifle market innovation.

### III. THE EQUITABLE RELIEF PLAINTIFF SOUGHT IS APPROPRIATE

#### a) An TRO Directing Defendant to Retract and Refrain From Filing is Appropriate

The authority of a court to issue a preliminary injunction under Rule 65 derives from "traditional principles of equity jurisdiction" and is "not altered by [Rule 65]." *Grupo Mexicano de Desarrollo S. A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999).

Plaintiff requests a temporary injunction requiring that the Defendant refrains from filing future complaints using the '551 Patent. Plaintiff also requests a temporary injunction ordering that the Defendant retract the already filed complaint to Amazon (Complaint ID: 16652447091 ). Without such relief, Defendant may file complaints using the '551 Patent over and over again, rendering Plaintiff experience the same kind of harm and suffering repetitively. Such injunction is also necessary to stop the ongoing harm to Plaintiff such as loss of customers, and loss of goodwill. This narrow injunctive relief would strike the right balance in equity and benefits the public interest in general, especially since Amazon does not reactivate removed product listings unless the Rights Owner sends an e-mail to Amazon authorizing reactivation, or the Rights

Owner submits a retraction.

    **b) Plaintiff is Willing to Post Bond**

Here, the TRO seeks nothing more than to maintain the status quo where both Plaintiff and Defendant can sell on on-line marketplaces and compete freely. It prevents the Defendant from profiting from a malicious Patent Infringement Complaint. For the reasons stated above, Defendant will suffer no damage from the TRO since Plaintiff does not infringe its patent. The Defendant still has opportunities to prove its case and show patent damages (if even possible). If a bond is what the Court requires, Plaintiff is willing to post $10,000 bond to show its commitment to this court to fight this non-infringement lawsuit.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court grant the *ex parte* TRO Application in its entirety.

Date: November 25, 2024                               /s/ Ruoting Men
Ruoting Men, Esq
GLACIER LAW LLP
41 Madison Avenue, Suite 2529
New York, NY 10010
Ruoting.men@glacier.law

***Attorney for Plaintiff***